## WILLSMORE v OCEOLA TOWNSHIP

Docket No. 44835. Submitted June 4, 1980, at Lansing.—Decided June 3, 1981. Leave to appeal applied for.

Duane Willsmore, while hunting on unposted and unoccupied property in Oceola Township, found a substantial sum of money buried in a watertight suitcase. Willsmore informed the State Police of his find. The State Police took custody of the money and eventually it was deposited in an interest-bearing account. Willsmore subsequently filed an action for declaratory judgment in Livingston Circuit Court in order to obtain a determination of the ownership of the money. The State of Michigan intervened in the suit, claiming right to the money under the Code of Escheats. The Township of Oceola claimed an interest in the money under the Lost Goods Act. The land contract vendee of the land, Thomas Powell, also intervened, alleging true ownership of the money and that his rights as a land contract vendee of the property upon which the money was found also entitled him to the money. By the time of trial, Powell's interest in the land had been terminated by a writ of restitution entered against him. Paul R. Mahinske, J., granted summary judgment to Willsmore and the township. This judgment was appealed and in an earlier decision the Court of Appeals reversed the trial court and remanded the case for a full hearing on the facts. *Doe v Oceola Twp,* 84 Mich App 514; 270 NW2d 254 (1978). At the trial's conclusion, the Court

REFERENCES FOR POINTS IN HEADNOTES

[1] 1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property § 34.
[2] 1 Am Jur 2d, Abandoned, Lost, and Unclaimed Property § 25.
[3] 16A Am Jur 2d, Constitutional Law § 849.
    81 Am Jur 2d, Witnesses § 468.
[4] 75 Am Jur 2d, Trial §§ 319–326.
[5, 13, 14] 1 Am Jur 2d, Abandoned, Lost, or Unclaimed Property § 28.
[6, 11] 1 Am Jur 2d, Abandoned, Lost, or Unclaimed Property § 4.
[7] 27 Am Jur 2d, Escheat §§ 10–14, 32.
[8, 9] 27 Am Jur 2d, Escheat § 3.
[10] 1 Am Jur 2d, Abandoned, Lost, or Unclaimed Property §§ 18, 19.
[11] 1 Am Jur 2d, Abandoned, Lost, or Unclaimed Property § 2.
[12, 14] 1 Am Jur 2d, Abandoned, Lost, or Unclaimed Property § 19.

entered a directed verdict in favor of Willsmore and the township and held that the money should be divided in an approximately even split. All parties except the township appeal. *Held:*

1. Powell's claim as true owner of the money fails as a matter of law. In order to establish ownership, he was required to carry the burden of proof. Because of his continued assertion of the right to remain silent, relevant cross-examination was impossible.

2. The brief period of time that the money was buried effectively eliminates the Code of Escheats from application here. The Code has always been strictly construed and the burden is on the state to prove that the property is escheatable. The Code is generally not applied to individual holders of funds.

3. There is no Michigan precedent which requires the Court of Appeals to grant Powell possession of the money under a theory of constructive possession based upon his status as land contract vendee. Adoption of a principle of law granting possession to a land contract vendee would set an impracticable precedent.

4. The Lost Goods Act is interpreted to be a finder's statute and is applicable to this money. The act provided certainty of title to property by eventually vesting clear title after a set period of time. It encourages honesty in finders by providing penalites for not turning in property in accord with its provisions and providing incentives for compliance. The act provides for notice to potential true owners and publication to seek them out. The public obtains a portion of the benefit of a find through receipt of one half of the value by the township. The finder receives an award for his honesty by receiving one half of the value of the property plus costs.

Affirmed.

1. ABANDONED AND LOST PROPERTY — NOTICE — STATUTES.

A person finding property shall (1) give notice to potential owners, (2) post notice in two places within the township of the find, (3) publish notice in a newspaper if the goods are of a value of $10 or more, and (4) give notice in writing to the township clerk (MCL 434.1 *et seq.;* MSA 18.701 *et seq.).*

2. ABANDONED AND LOST PROPERTY — TRUE OWNERSHIP.

It is a universally accepted fundamental principle of property law that the true owner, assuming he presents himself within the statutory limitation period, is entitled to the property he lost and which was found by another person.

3. CONSTITUTIONAL LAW — FIFTH AMENDMENT — CROSS-EXAMINATION — CIVIL SUITS.

The Fifth Amendment may act as a shield to protect a party from cross-examination which would tend to incriminate him in a civil suit.

4. WORDS AND PHRASES — JURORS — JUDGES.

Jurors do not answer the questions of law; judges do not answer the questions of fact (Ad questiones legis non respondent juratores; ad questiones facti non respondent judices).

5. ABANDONED AND LOST PROPERTY — FINDER'S HONESTY.

An obvious goal of any scheme of legislation to reunite ownership and possession of property is honesty on the part of the finder; if honesty is not encouraged, human nature will limit the number of times that such finds are reported.

6. PROPERTY — TREASURE-TROVE.

The property law doctrine of treasure-trove was never adopted in Michigan; very few states incorporated this English classification of property into their common law.

7. ESCHEAT — ABANDONED AND LOST PROPERTY — ATTORNEY GENERAL — STATUTES.

The Attorney General has the power to intervene to claim property as escheatable upon one of three grounds: (1) death of an owner intestate with no known heirs; (2) an owner's disappearance or absence from his last known place of residence for a continuous period of seven years leaving no known heirs; or (3) an owner's abandonment of the property (MCL 567.11 et seq.; MSA 26.1053[1] et seq.).

8. ESCHEAT — ABANDONED AND LOST PROPERTY — PERIOD OF DORMANCY — STATUTES.

The State of Michigan has no interest in property which appears to have been separated from its owner or one who has a right to possession under the Code of Escheats until a period of dormancy has run; a period of dormancy is a full and continuous period of seven years during which an owner has ceased, failed, or neglected to exercise dominion or control over his property or to assert a right of ownership or possession (MCL 567.15[f]; MSA 26.1053[5][f]).

9. ESCHEAT — SOVEREIGN — STATUTES.

The Law of Escheats developed out of the need for a sovereign to take title when tenure failed because of the absence of heirs;

the statute has always been strictly construed, and the burden is on the state to prove that the property is escheatable.

10. ABANDONED AND LOST PROPERTY — LOCUS IN QUO.

Certain old common-law precedents, including the doctrine called *"locus in quo"*, provide that a property owner would be given the right of first possession to hold property for the return of the true owner; the theory is based on the assumption that the owner will be able to find property if it remains in the hands of someone tied to the location where the property was found.

11. ABANDONED AND LOST PROPERTY — LOCUS IN QUO — LOST GOODS ACT.

Distinctions between property embedded in the soil, mislaid property and *"locus in quo"* did not develop until after the enactment of the Lost Goods Act.

12. ABANDONED AND LOST PROPERTY — LOST GOODS ACT — FINDER'S STATUTE.

The Lost Goods Act is interpreted to be a finder's statute (MCL 434.1 *et seq.;* MSA 18.701 *et seq.*).

13. ABANDONED AND LOST PROPERTY — PUBLIC POLICY — FINDERS OF PROPERTY.

Public policy in favor of honesty by finders of property supports vesting clear title in them at some point; to do otherwise would cause practical problems of continuous bailment.

14. ABANDONED AND LOST PROPERTY — LOST GOODS ACT — STATUTES.

The Lost Goods Act provides protection to the finder, a reasonable method of uniting goods with their true owner, and a plan which benefits the people of the state through their local governments (MCL 434.1 *et seq.;* MSA 18.701 *et seq.*).

*Draugelis, Ashton & Scully,* for plaintiff.

*Foster, Swift, Collins & Coey,* for Oceola Township.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *George H. Weller,* Assistant Attorney General, for state parties.

*Michael J. McGivney,* for Thomas Powell.

Before: DANHOF, C.J., and M. J. KELLY and G. R. CORSIGLIA,* JJ.

G. R. CORSIGLIA, J. An appeal is taken from an order of the Livingston County Circuit Court awarding money found in a suitcase buried on vacant, open and unimproved land to the finder, Duane Willsmore, and the Township of Oceola, pursuant to the provisions of the Lost Goods and Stray Beasts Act, MCL 434.1 *et seq.;* MSA 18.701 *et seq.,* (hereinafter referred to as the "Lost Goods Act"). Interested persons are referred to a prior decision of this Court upon appeal from a summary judgment entered in this case. *Doe v Oceola Twp,* 84 Mich App 514; 270 NW2d 254 (1978).

This case is framed as a declaratory judgment action under GCR 1963, 521. Upon remand, following trial, various motions for directed verdict were granted by the trial court, and the case was withdrawn from the jury. The order and the judgment at issue adjudicated the respective rights of the parties to the money; hence, for purposes of clarity, all parties will be referred to as "claimants" irrespective of their status as plaintiffs or defendants below.

The claimants involved in this litigation are as follows:

(1) Duane Willsmore, the finder;

(2) The Township of Oceola, claimant under the provisions of the Lost Goods Act;

(3) Thomas Powell, the land-contract vendee, also claiming the money as the "true owner";

(4) The State of Michigan through the Attorney General, claimant under the Code of Escheats, MCL 567.11 *et seq.;* MSA 26.1053(1) *et seq.*

The Director of the Michigan State Police was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

dismissed at trial as an unnecessary party and does not present issues on appeal. The land contract vendors voluntarily relinquished any claim that they may have had for the money and are not parties to this suit.

Briefly, the facts are as follows: While hunting on unposted and unoccupied property in Oceola Township in October of 1974, claimant Duane Willsmore found a substantial amount of money ($383,840) buried in a watertight suitcase. He was attracted to the buried suitcase because he noticed an area with branches arranged in a crisscross pattern. When he kicked aside the branches and sod, he found the suitcase in a freshly dug hole. Willsmore took the suitcase, as yet unopened to his home. Later the same day he informed the State Police of his find. A state trooper and claimant Willsmore together pried open the suitcase and discovered the money inside. The State Police took custody of the money, and eventually it was deposited in an interest-bearing account.

Albeit a bit tardily, claimant Willsmore complied with the provisions of the Lost Goods Act of Michigan. This act provides that the finder shall give notice to potential owners, post notice in two places within the township of the find, publish notice in a newspaper if the goods are of a value of $10 or more and give notice in writing to the township clerk. The statute requires that these things be done within very short time periods. Claimant Willsmore did not comply with the strict language of the statute. This lapse is understandable in light of the advice he received from the police. After the State Police took custody of the suitcase, they told the finder and his wife to keep silent about the money, informed them that their lives might be in danger, suggested that leaving

town for a time might be a good idea and even transported them in a state vehicle at speeds reaching up to 100 m.p.h. accompanied by officers armed with rifles. There is no indication on the record that the delay in complying with the provisions of the Lost Goods Act was a willful refusal to comply, or that it caused it to be more difficult for the true owner of the money to be located. Indeed, claimant Willsmore's initial action upon finding the property was to notify a governmental authority, not attempt to keep it himself. It is understandable that after receiving instructions from the State Police to keep quiet, claimant Willsmore did not act within the time limits set in the statute. As an initial note, this Court affirms the finding of the trial court that claimant Willsmore substantially complied with the notice provisions of the Lost Goods Act. See *Meredith v Melvindale,* 381 Mich 572; 165 NW2d 7 (1969).

Claimant Willsmore filed a declaratory judgment action in order to obtain a determination of the ownership of the money he found. The State of Michigan intervened in the suit, claiming right to the money under the Code of Escheats. The Township of Oceola claimed an interest in the money under the Lost Goods Act. The land contract vendee, Thomas Powell, also intervened, alleging true ownership and that his rights as a land contract vendee of the property upon which the money was found entitled him to the money. Claimant Powell had been the land contract vendee for less than three months when the money was found. By the time of trial, claimant Powell's interest in the property had been terminated by a writ of restitution entered against him. The land contract vendors declared earlier that they wanted no interest in the money.

Prior to trial, the trial court granted a motion for summary judgment in favor of the finder and the township. This judgment was appealed, and in a prior decision this Court reversed the lower court and remanded for a full hearing on the facts. *Doe v Oceola Twp, supra.* After several days of trial, at the trial's conclusion, the court made rulings of law sufficient to dispose of the case on motions for directed verdict. The court found in favor of the finder, Duane Willsmore, and the Township of Oceola, under the Lost Goods Act, and divided the money in an approximate fifty-fifty split. All parties except the township appeal.

Since this case involves a substantial sum of money and substantial uncharted areas of law, this Court feels compelled to discuss the various arguments on appeal in detail. Although the law in this area is somewhat confused, it is a universally accepted fundamental principle of property law that the true owner, assuming he presented himself within the one-year statute of limitations of the Lost Goods Act, would be entitled to the money before any other party in this case. However, true ownership must be established to the satisfaction of the court.

On the point, this Court affirms the trial court's directed verdict against claimant Powell asserting a right to the money as the true owner. In the prior appeal from a summary judgment granted by the trial court, this Court remanded, stating:

"In the instant case, final determination of the respective rights of each of the parties to the property discovered by plaintiff John Doe rests primarily upon both the weight and the credibility which the trial court assigns to the testimony of defendant Powell. Regardless of which legal theory the court chooses to apply to the facts of this case, if defendant Powell's

assertion of ownership were accepted by the trier of fact, he would prevail." *Id.,* 519.

Upon remand, the trial court concluded, as a matter of law, that claimant Powell's assertion of true ownership failed.

Voluntarily, and perhaps wisely, claimant Powell did not present himself at trial. His attorneys attempted to introduce his deposition testimony, and the trial court ruled that it was inadmissible. In a civil suit the Fifth Amendment may act as a shield to protect a party from cross-examination which would tend to incriminate him. However, claimant Powell attempted to use it as a sword and his absence at the trial was by choice.

In addition, because of his continued assertion of the right to remain silent in the face of relevant cross-examination questions at his deposition, the trial court had an alternative basis for excluding the deposition testimony. Claimant Powell argues on appeal that he answered inquiries at his deposition regarding facts sufficient to establish his ownership of the money. He argues that many of the questions at the deposition were unrelated to the facts at issue, and the Attorney General was attempting an impermissible fishing expedition in search of incriminating evidence. However, our reading of the deposition testimony compels us to concur with the ruling of the trial judge. Claimant Powell sought to use, as a standard for answering questions, his own attorney's opinion, or his personal opinion, whether the questions were germane to the issues before the court. Such a standard is almost inevitably self-serving. At Powell's deposition, virtually the only answer he would give was the bald assertion that he was the true owner of the money. When asked the sum of money in the suitcase, his answer was incorrect.

Due to the nature of the controversy, it was required that a party claiming as true owner prove his ownership. When faced with questions about how he obtained the money and hid it, claimant Powell had the right to assert his constitutional privilege to remain silent. However, the Court not only had the right, but also the duty, to conclude from such silence that claimant Powell did not carry his burden of proof. His right to the money in light of his deposition testimony, even if it were admissible, is an issue about which a trier of fact could reach but one conclusion.

Claimant Powell's claim as true owner fails as a matter of law. In order to establish ownership, he was required to carry the burden of proof. Because of his continued assertion of the right to remain silent at his deposition, relevant cross-examination was impossible. Claimant Powell, by choice, did not testify at the trial. Other evidence bearing on his alleged ownership of the money was not admissible because of its nature as hearsay. The trial court was justified in granting a directed verdict against claimant Powell, claiming as the true owner. *Ad questiones legis non repondent juratores; ad questiones facti non respondent judices.* (Jurors do not answer the questions of law; judges do not answer the questions of fact.)

Claimant Powell is the only party in this suit making a claim as the true owner of the money. Although this case does not reach the happy conclusion of returning the money to its true owner, this should not obscure other desirable policies of the law involved. It is doubtful that there is a person alive today who has not inadvertently parted with some possession of value. The statutes involved in this case were enacted by a Legislature composed of such human beings. This Court will

assume as its touchstone that the Legislature intended to create a system of law which would reunite people with the things that they prize, should they become separated from them. Balancing this goal is the need for certainty of title to property. In addition, an obvious goal of any scheme of legislation to reunite ownership and possession is honesty on the part of the finder. If honesty is not encouraged, human nature will limit the number of times that such finds are reported. Surprisingly, in spite of our unfortunate tendency to lose track of our possessions, very little case law has developed in Michigan under the Lost Goods Act or the Code of Escheats. Consequently, this Court is confronted with a situation involving basic statutory construction.

The property law doctrine of "treasure-trove" was never adopted in Michigan. Indeed, very few states in this country incorporated this English classification of property into their common law since its historical development was derived from the plundering Roman armies. As far as history records, the Romans did not plunder across the Atlantic Ocean. We decline to adopt the rule where the reason does not apply. Further, in the prior decision of the Court of Appeals in this case, it was stated:

"As the disputed fact of defendant Powell's ownership of the property discovered by plaintiff John Doe has such important ramifications upon the legal rights of the parties, we find it appropriate that this matter be returned to the trial court in order that the weight and credibility to be given his testimony may be determined in a trial on the merits. Should any part of his testimony be disbelieved, the court will be forced to make other determinations of fact, bearing especially upon the intent of the original 'owner' which also should be made following a full trial." *Id.,* 521.

In the prior decision of this Court, a summary judgment by the trial court was considered. The posture of the case following a full trial upon remand is very different. The trial court had before it certain undisputed facts following the presentation of proofs, including the approximate age of the money buried. It is undisputed from the trial testimony that the money had been in the ground for only a few months, at most. The teller bands wrapped around part of the money indicated that recently it had been in a bank. Hence, even if the doctrine of treasure-trove were a part of Michigan law, it could not apply in the instant case.

The brief period of time that the money was buried also effectively eliminates the Code of Escheats from application to this case. As noted by this Court in its prior decision, the state carries the burden of establishing its right to escheatable property. The Attorney General has the power to intervene to claim property as escheatable upon one of three grounds:

(1) Death of an owner intestate with no known heirs;

(2) Owner's disappearance or absence from last known place of residence for a continuous period of seven years leaving no known heirs; or

(3) Owner's abandonment of the property.
See MCL 567.14; MSA 26.1053(4).

Clearly, the first two possible grounds for state control of this money do not apply. No evidence was introduced at trial indicating the death of the owner intestate with no known heirs. Undisputed evidence was introduced indicating the money had been buried only a few months.

It is the third basis of standing which might appear to apply in this case. At first glance, it seems that the trier of fact had an issue to resolve,

to-wit: Whether the property was "abandoned" within the common understanding of the term. If so, the case would have been incorrectly withdrawn from the jury by the trial court. However, the Code of Escheats establishes a clear, narrow definition of "abandonment" which could not apply to the money based on undisputed facts before the trial court. Under the Code of Escheats, "abandoned property" is defined as "property against which a full period of dormancy has run". MCL 567.15(e); MSA 26.1053(5)(e). A "period of dormancy" is defined to mean a full and continuous period of seven years during which an owner has ceased, failed, or neglected to exercise dominion or control over his property or to assert a right of ownership or possession. MCL 567.15(f); MSA 26.1053(5)(f). Until a period of dormancy has run, the state has no interest in property which appears to have been separated from its owner or one who has a right to possession. If claimant Powell had left the money with the State Police for seven years without asserting a right to it, the Code would apply. Such is not the case before this Court.

Clearly, money in the ground for only a few months does not fall within the plain language of the Code of Escheats. Nor does it fall within the policy and historical derivation of the Code. The Law of Escheats developed out of the need for a sovereign to take title when tenure failed because of the absence of heirs. The statute has always been strictly construed, and the burden is on the state to prove that the property is escheatable. Initially, the Code of Escheats involved only real property. It was later expanded to cover personal property in certain narrow instances. In general, it covers personal property in situations where the

property has been left with holders who would not be considered "finders" in the usual sense. For example, it is commonly applied to banks and similar institutions. It is generally not applied to *individual holders of funds.*

The Attorney General argues that the Code should apply because it does not cut off title. However, we note that a true owner who does not present himself to reclaim property within a reasonable time and after reasonable publicity is unlikely to suddenly appear at a later date. Effectively then, in most such cases, the act would place title and benefit of a find in the sovereign. No provision exists giving a reward to a finder such as claimant Willsmore. While such a construction of the Code of Escheats may benefit the people of the State of Michigan when the found property is a large sum of money, this Court perceives an overriding public policy in favor of the individual honest-citizen finder of the property. We hold that the Code of Escheats is not applicable to the instant case.

Claimant Powell asserts an interest in holding the funds as the land contract vendee. Under certain old common-law precedents, including the doctrine called *"locus in quo"*, a property owner would be given the right of first possession to hold property for the return of the true owner. The theory is based on the assumption that the owner will be able to find property if it remains in the hands of someone tied to the location where the property was found.

Claimant Powell cites *Oakland County v Bice,* 386 Mich 143; 191 NW2d 338 (1971), in support of his right to possession. However, the case is not on point. In *Oakland County,* the Supreme Court held that certain money taken from the defendant

should be returned, although the defendant would not answer questions regarding the way it was obtained, citing possible self-incrimination. The case is distinguishable from the instant case because the defendant in *Oakland County* had clear and undisputed prior possession of the money and possession was wrongfully disturbed. Consequently, absent proof of some better right of possession, the money should be restored. In the instant case, claimant Powell has established no similar clear right of prior possession. His claim as the true owner who would be entitled to possession failed as a matter of law. He was not in possession of the property upon which the money was found. At best, he claims under a theory of constructive possession as the land contract vendee.

This Court can find no precedent in Michigan which would require it to grant claimant Powell possession of the money under a theory of constructive possession based upon his status as land contract vendee. Land contracts are frequently used as a method of conveyance in Michigan. Adoption of a principle of law granting possession to a land contract vendee would set an impracticable precedent. The interest of a land contract vendee is not always of record. Further, under rules of forfeiture, frequently land contracts do not result in ultimate title. In this case, testimony at trial indicated that claimant Powell no longer even retained an interest in the property upon which the money was found. A true owner returning in search of his goods would find it very difficult to locate a holder in the position of claimant Powell. Title records would not necessarily record his existence. He did not have possession of the property at the time of the find, nor at any later date. Indeed, under the terms of the land

contract, it was unlikely that he was able to take possession at the time of the find in a manner likely to reunite the true owner of the money with his funds. Due to the frequent use of land contracts in Michigan, this Court does not find a basis to award the money to claimant Powell by establishing a precedent in favor of the *locus in quo* owner.

This Court finds that the Lost Goods Act is applicable to this property. It could be argued that applying the Lost Goods Act to a suitcase buried on another's land will encourage inappropriate behavior on the part of people in order that they might become "finders" under the provisions of the act. However, upon reflection, this argument is of limited merit. In the type of case where such a "find" would be inappropriate, the publicity given under the provisions of the Lost Goods Act would bring forward the true owner of the property, very possibly the property owner upon whose land it was found. Notice provisions would require notice to this potential true owner. In addition, in a different factual context, the remedy of trespass would be appropriate to discourage such "finds". The facts of this case do not support a trespass argument against the finder. The testimony indicated that the land was unposted and unoccupied, and that it had been hunted upon for many years by claimant Willsmore without objection. At best, this was a technical trespass, and the land contract vendee was not in possession to assert such a suit.

The Lost Goods Act encourages the goals which this Court considers important in such cases. It provides certainty of title to property by eventually vesting clear title after a set period of time. It encourages honesty in finders by providing penal-

ties for not turning in property in accord with its provisions and providing incentives for compliance. The act provides notice to potential true owners and publication to seek them out. It provides for registration of the find in a central location where an owner could locate the goods with ease. Parenthetically, this Court notes that the registration more effectively serves the purpose than leaving the goods with the *locus in quo* owner. The Lost Goods Act provides for appraisal of the goods. There is a reasonable time limit before title to goods is cut off from the former owner or holder. The public obtains a portion of the benefit of a find through receipt of one half of the value by the township. The finder receives an award for his honesty by receiving one half of the value of the property plus costs.

Parties to this suit urge this Court to draw a distinction between categories of found property. Many of these distinctions are derived from the common law of other states. This Court has examined the case law precedent in Michigan both prior to the Lost Goods Act and following its enactment. The Michigan Lost Goods Act is a very old statute, dating back to the early nineteenth century. In the historical development of the common law, distinctions between "property embedded in the soil", "mislaid property" and *"locus in quo"* did not develop until after the enactment of the Lost Goods Act. The doctrine of "property embedded in the soil" did not become a part of the common law until the late nineteenth century. See, *e.g., Elwes v Brigg Gas Co,* 33 Ch D 562 (1886), *Allred v Biegel,* 240 Mo App 818; 219 SW2d 665 (1949). "Mislaid property" was also developed as a doctrine by the common-law courts in the late nineteenth century. See *Deaderick v Oulds,* 86 Tenn

14; 5 SW 487 (1887), *Foster v Fidelity Safe Deposit Co*, 264 Mo 89; 174 SW 376 (1915), A.E.S. Tay, *"Problems in the Law of Finding: The U.S. Approach"*, 37 Australian Law J 350, 351 (1964). The doctrine of the *"locus in quo"* was brought into existence in the mid-nineteenth century. See *Bridges v Hawkesworth*, 21 LJQB 75; 15 Jur 1079 (1851), 8 Am J Leg Hist 224, 235 (1964). It should be noted that all three doctrines were developed subsequent to the drafting of the Michigan Lost Goods Act. Hence, to expect the act as drafted with the term, "lost goods", to reflect such distinctions is inappropriate. "Lost property", as used in the act, is a broad generic category. We construe the act in terms of the understanding its draftsmen would have had of the term, "lost property". We conclude that the statute is in effect a "finder's statute".

The provisions of the act are an eminently reasonable solution to a troublesome problem. Obviously there is a potential for a true owner to turn up in a year and a day to discover that his title has been cut off. However, a line must be drawn to establish clear title to goods at some point. The line which the Legislature has drawn in the Lost Goods Act appears to be a reasonable exercise of legislative judgment. The publicity provided by the provisions of the act will provide some protection for the true owner. Public policy in favor of honesty by finders supports vesting clear title in them at some point. To do otherwise would cause practical problems of continuous bailment. As an early Michigan case noted, the finder of lost goods under the common law obtained only first possessory rights better than all but the true owner. If a true owner were to present himself at a later date, even years after goods were found, the holder of

the goods would have to give a good account. The holder (finder) was placed in the position of a permanent bailee for the true owner. *Wood v Pierson,* 45 Mich 313; 7 NW 888 (1881).

The Lost Goods Act provides protection to the finder, a reasonable method of uniting goods with their true owner, and a plan which benefits the people of the state through their local governments. The trial court correctly applied it in this case to grant motions for a directed verdict in favor of the finder, Duane Willsmore, and the Township of Oceola.

Affirmed. No costs, a public question being involved.